IN RE the MARRIAGE OF Beverlee DENNIS and David Dennis: David DENNIS, Appellant-Petitioner,

v.

STATE of Wisconsin,[1] Respondent.

Supreme Court

*No. 81–2033. Argued November 30, 1983.— Decided February 28, 1984.*

(Also reported in 344 N.W.2d 128.)

---

[1] The respondent is the State of Wisconsin, rather than Beverlee Dennis, because Beverlee was receiving AFDC and the state

For the petitioner there was a brief by *David M. Erspamer* and *Cwayna, Novitzke, Byrnes, Gust & Williams,* Amery, and oral argument by *Mr. Erspamer.*

For the respondent there was a brief by *Thomas R. Marlier,* corporation counsel, Barron, and oral argument by *Mr. Marlier.*

STEINMETZ, J. The issue in this case is whether the circuit court may in enforcing a child support order require this divorced father to make a search for other employment to increase or to add to his limited income. An additional issue is whether the defendant received proper notice and a hearing under the provisions of secs. 767.305 and 785.03(1)(a), Stats.,[2] to allow a finding of civil contempt.

[2] Secs. 767.305 and 785.03(1)(a), Stats., provide as follows:

"**767.305 Enforcement; contempt proceedings.** In all cases where a party has incurred a financial obligation under s. 767.23, 767.25, 767.255, 767.26, 767.261 or 767.262 and has failed within a reasonable time or as ordered by the court to satisfy such obligation, and where the wage assignment proceeding under s.

On September 19, 1979, the matter came before the circuit court of Barron county, the Honorable James C. Eaton, on a petition for divorce filed by Beverlee Dennis. Three minor children were born of this marriage between the defendant, David Dennis, and Beverlee Dennis. The youngest was born in 1975 and the oldest in 1972.

The parties appeared before a family court commissioner for Barron county who ordered Dennis to pay $35 weekly as family maintenance commencing October 1, 1979.

On February 25, 1980, Dennis appeared before the circuit court at an order to show cause hearing for contempt brought by the Barron County Family Support Agency. As a result of that hearing, the court reduced his support obligation to $15 per month, which was $5 per child per month, and ordered payment of $5 monthly toward arrearages of $560.

Pursuant to the final hearing of March 24, 1981, with respect to child support, the court ordered:

"That the court agrees with Mr. Thexton [Arthur Thexton, Barron county assistant district attorney] that the respondent should pay $300.00 per month for child support. It appears that respondent does not have the present ability to do so. The respondent appears in good health, has ability and a good mind. That he should look for additional or alternative work because it appears that he has never made over $3,500.00 per year in his past endeavors. That respondent is ordered to use his good faith efforts to apply for other work at least in ten

767.265 is inapplicable, impractical or unfeasible, the court may on its own initiative, and shall on the application of the receiving party, issue an order requiring the payer to show cause at some reasonable time therein specified why he or she should not be punished for such misconduct as provided in ch. 785."

"785.03 **Procedure.** (1) NONSUMMARY PROCEDURE. (a) *Remedial sanction.* A person aggrieved by a contempt of court may seek imposition of a remedial sanction for the contempt by filing a motion for that purpose in the proceeding to which the contempt is related. The court, after notice and hearing, may impose a remedial sanction authorized by this chapter."

places per month, and be in a position to show such compliance and efforts made; that he is to promptly report to the Barron County Department of Social Services of any additional or alternative employment obtained.

"That the court reserves jurisdiction over the issue of support for the children, and the matter shall be reviewed on July 20th, 1981 at 9:00 a.m., at which time the respondent is ordered to appear before the court. . . ."

The order regarding the March 24, 1981, hearing was signed on April 27, 1981.

On March 30, 1981, six days after the final hearing, the attorney for Dennis filed a motion for reconsideration with the court asking the court to reconsider the "seek-work" order on the grounds that such an order constituted an abuse of discretion.

At the hearing on the motion for reconsideration held on June 29, 1981, the court again took notice of the fact that Dennis had never earned over $3,500 per year and then stated that this income was insufficient to permit reimbursement of the AFDC payments for his family. The court reasoned that Dennis's earning history strongly suggested that in the future he would not earn enough to meet the AFDC payments. Additionally, the court noted: "I made it a condition of the judgment that he [Mr. Dennis] in essence get a job or at least apply at ten separate businesses per month for work."

On July 20, 1981, Dennis again appeared in court pursuant to the court's order in the judgment to return to court on that date. At this appearance, Dennis introduced into evidence a list of 30 separate employers he had contacted regarding employment. He testified that he had called each of the 30 employers, inquiring as to whether they were accepting employment applications. He stated that in many cases, the employers were not taking applications and so he did not drive to those

places. No further breakdown appears in the record of actual applications made.

The court renewed its order at the July 20, 1981, hearing to seek information regarding alternative or additional employment. This renewed order again required Dennis to apply for work with ten separate employers per month, and, in addition, on the record, the judge imposed another obligation. The additional obligation was for Dennis to apply to both Polk County and Barron County Job Services, and to follow all leads suggested by such Job Services. The court ordered Dennis to appear again before the court on September 14, 1981, and at that time then to demonstrate compliance with the continuing seek-work order.

Dennis appeared on September 14, 1981, pursuant to the court's order; however, time was limited for the taking of testimony, and consequently, the court ordered Dennis to appear before the court on October 22, 1981, and then to show compliance with the seek-work orders of the court.

On October 22, 1981,[3] Dennis appeared before the court and at that hearing testified that he had not kept a list of employers to whom he had submitted applications. However, he stated he had talked to several people in an effort to seek work and named three specific persons and that he had talked to "quite a few people" with no success. He stated he had not been to either county Job Service, but had watched the "help wanted" section of the newspaper.

At the October 22, 1981, hearing, Dennis testified that he had been in the car repair business off and on for 20 years, although steadily for ten years, but had operated his present automobile garage business at its present location for only about a year. His business

---

[3] The transcript of that hearing is dated October 23, 1981.

gross receipts averaged $500 to $700 monthly with his take-home pay at about $300 monthly. His personal monthly expenses included $200 for food, part of which went to feed his three children who spent some weekends with him. As part of the property division in the divorce, Dennis mortgaged his trailerhouse for half its value, and thereby paid his wife $2,000. His monthly payment toward that mortgage was $105. His monthly gasoline expenses for his 1973 Ford pickup truck were $160 which included driving to and from work and driving to auto parts suppliers to obtain parts for his work. He deducted his gasoline expenses from his gross receipts. His other monthly business expenses were telephone charges of $15 to $20, gas and oxygen charges for welding purposes of $40 to $50, electricity charges of $20 to $25, and rental of the building for which he did mechanical work for the landlord as payment.

Dennis testified that because of his limited income and monthly expenses, he could not afford to comply with the court's order that he apply for ten different jobs per month. Nor could he afford to drive weekly to both Polk and Barron County Job Services and to follow up leads those services might suggest. At the time of the hearing, he had nothing in his checking account and did not have any savings. At that time he still owed nearly the entire $2,000 sum borrowed from the bank in order to provide his wife with the property settlement.

Dennis indicated he worked six days per week and worked between 8:00 a.m. and 6:00 p.m. He testified he never passed up nor avoided any work unless it was unlikely that he would be paid for his services. There was no direct evidence at any hearing that Dennis intentionally shirked or avoided work. Mrs. Dennis testified that he had always been a hard and steady worker but he never made a net of over $3,500 per year.

At the close of the October 22, 1981, hearing, the court found its order to seek-work within the court's authority and found Dennis in willful contempt of court. Dennis was sentenced to 60 days in the Barron county jail under the work release program and was allowed to purge the contempt by payment of $800 to the Barron county clerk of court. The court found him in contempt on two bases:

(1) For failing to make application for work as ordered, and

(2) For failing to make child support payments of $15 per month or $5 per month on the arrears as ordered.

The court of appeals in a published opinion, 110 Wis. 2d 442, 329 N.W.2d 272, affirmed the trial court's holding that the court had the inherent power to order Dennis to look for other work. The court of appeals reviewed the record and held Dennis's testimony incredible which led that court to the "inescapable conclusion" that Dennis had undisclosed income. The trial court had not made such a finding. The court of appeals found the holding of contempt sustained by the evidence and that the purge ordered by the trial court was within Dennis's ability to meet by borrowing on his remaining equity in the lot and mobile home.

The trial court's findings of fact and conclusions of law and order were later incorporated into a Barron county "form order"[4] dated July 22, 1981, which im-

---

[4] The relevant portions of the order are as follows:

"3. EMPLOYMENT: David Ira Dennis shall actively and diligently seek work, including but not limited to:

"(a) Going to Job Service once a week and following up on all leads.

"(b) Applying for work at 10 new places each month for jobs which he can perform.

"(c) Keeping a list of places and dates of applications filed.

"(d) Reading the Help Wanted section of local newspapers and responding to appropriate ads.

posed the additional obligation that the divorced party shall, "Not refus[e] any job which he is physically able to do, even if the job is not in his chosen trade or occupation, or is not full-time, or pays less than the pay he is used to, or is temporary." This form order provision is not in issue in this case, since Dennis was never ordered to take a specific job, but only to seek work and, therefore, we will not discuss it. What is before this court is the order of the trial court which required the defendant to "seek-work" other than or in addition to his present business and whether the defendant had proper notice and hearing before being found in willful contempt for his failure to comply with the miniscule support order. The defendant also contests the trial court's authority to retain jurisdiction over him for over seven months after the final divorce hearing for the purpose of enforcing the "seek-work" order.

The trial court did not order the defendant to take another or different job, but only to seek other work. The rule of *Balaam v. Balaam*, 52 Wis. 2d 20, 187 N.W. 2d 867 (1971). therefore is not controlling. In *Balaam*, we held:

"A divorced husband should be allowed a fair choice of a means of livelihood and to pursue what he honestly feels are his best opportunities even though he might for the present, at least, be working for a lesser financial return. This rule is, of course, subject to reasonableness commensurate with his obligations to his children and his former wife." *Id.* at 28.

The *Balaam* rule is not an absolute prohibition against a trial court requiring a divorced supporting spouse to

"(e) Reporting by telephone to the Barron County Family Support Agency once a month and within 1 business day of obtaining a job.

"(f) Not refusing any job which he is physically able to do, even if the job is not in his chosen trade or occupation, or is not full-time, or pays less than the pay he is used to, or is temporary."

consider a change in livelihood, especially where as here Dennis's income as a mechanic has never exceeded $3,500 per year in the 20 years he has been practicing it, and it has not increased since he has become a garage operator. Not present in *Balaam* was the supporting father's claimed inability to pay $5 per month per child and $5 per month toward arrearage pursuant to the trial court's order as in this case. If ever there was a miniscule support order recognizing the party's lack of present earnings, this is it. It shows great respect and restraint by the trial judge for the present income limitations of the defendant and in no way reflects that the trial court was insisting that the defendant repay the AFDC payments his family was receiving.

*Edwards v. Edwards*, 97 Wis. 2d 111, 113, 293 N.W.2d 160 (1980), dealt with the issue of consideration of the divorced father's potential earning capacity rather than his actual earnings at the time of the divorce hearing. In analyzing *Balaam*, the *Edwards* court stated:

"We held in *Balaam* that the trial court's consideration of the husband's earning capacity, rather than his actual earnings, was improper because there was no finding—nor even a basis for a possible finding—that the husband was not 'fairly or diligently working at the occupation which he [was] best suited for, nor that he [was] willfully accepting employment and resultant lower compensation for the purpose of reducing his ability to pay alimony and support money.'" *Id.* at 119.

However, until the trial court requires the defendant to "seek work," which means alternative or additional employment, there can be no accurate and informed finding as to the defendant's ability to earn and what his worth is economically. Until that is known, the court has no way of testing the person's economic worth, but has only the fact of how the person has been and is earning a living. It is to the defendant's benefit to learn

his own value, and, in addition, perhaps to be better able to meet his financial responsibilities to his children and therefore comply with the court's order. The defendant should be interested in supporting his children the best he can and not be satisfied with society supporting them minimally on AFDC. He was not ordered to earn enough to repay AFDC but rather to seek work to investigate whether he is complacent by continuing in financially non-productive work just so he can feed, house and clothe himself.

Until the defendant and the judge know what other work and income is available, there is no way the judge can determine, except by suspicion, that the defendant can do no better and there is no way, except by way of inference, to determine that the defendant is satisfied with his own lot in life and is willing to allow society to support his children. To obtain definite and meaningful information, the order of the trial court is reasonable and must be complied with by the defendant. Telephone calls at random to possible employers do not appear to be a sincere nor effective means of seeking work information. The defendant in this case has not been ordered to abandon his occupation, as was the supporting father in *Edwards.* Dennis was not at that point. He was ordered to seek work and report to the court. The trial court read *Edwards* correctly, since in *Edwards* we held: "While a $3,200 a year income is obviously low, no attempt was made to ascertain whether better barbering jobs were available to Robert Edwards and, if so, how much he could be expected to earn in such a job." *Id.* at 120. The *Edwards* court thereby informed trial courts to have the supportive parent seek other work to learn whether his lot was improvable. The *Edwards* case impressed the need to examine the equities of each case in regard to income and potential income and that is what this trial court did by its "seek-work" order.

The "seek-work" order was not an abuse of discretion. It has been previously held in *Schroeder v. Schroeder*, 100 Wis. 2d 625, 631–32, 302 N.W.2d 475 (1981) that:

"Judges presiding in actions affecting marriage have no less power than judges presiding in other actions. It is clear that support payment, division of estate and maintenance orders issued by a court affect the rights and remedies of a party in an action and the judge is authorized and has the duty to assure those rights and remedies will not be impaired, impeded, defeated or prejudiced."

Sec. 767.01, Stats.,[5] declares Wisconsin courts have authority to do all acts and things necessary and proper in family actions to carry their orders and judgments into execution. We have held that courts, in addition to statutory authority to carry their orders and judgments into execution, have the inherent power to do so. *In Interest of D.L.D.*, 110 Wis. 2d 168, 180, 327 N.W.2d 682 (1983), we held: "Where a court is granted jurisdiction over subject matters, it is implicit in that grant of jurisdiction that a court can use the contempt power to effectively

---

[5] Sec. 767.01, Stats., provides as follows:

"**Jurisdiction.** (1) The circuit courts have jurisdiction of all actions affecting the family and have authority to do all acts and things necessary and proper in such actions and to carry their orders and judgments into execution as prescribed in this chapter. All actions affecting the family shall be commenced and conducted and the orders and judgments enforced according to these statutes in respect to actions in circuit court, as far as applicable, except as provided in this chapter.

"(2) A person who has sexual intercourse in this state thereby submits to the jurisdiction of the courts of this state as to an action brought under this chapter with respect to a child who may have been conceived by that act of intercourse.

"(3) An action under s. 767.45 may be brought in the county in which the child or the alleged father resides or is found or, if the father is deceased, in which proceedings for probate of his estate have been or could be commenced."

carry out the functions ordered by the legislature." *See also State v. Braunsdorf*, 98 Wis. 2d 569, 297 N.W. 2d 808 (1980). In our organized society, it is necessary that courts be able to carry out their orders. The propriety of those orders can be tested on appeal. In this case, the trial court needed to know the defendant's potential for earnings and gave the defendant every doubt by setting the support order according to his present earnings at a de minimis amount.

The trial court was within its authority to continue the case as it did to give the defendant a fair opportunity to comply with the order to seek work and to demonstrate payments consistent with the minimal support order. By continuing the case, the court never lost jurisdiction to require compliance with its orders.

This court can understand the frustrations of the trial court, the district attorney and the family support agency in their attempts to get Dennis to meet and carry out his responsibilities to comply with the court's orders. However, there is nothing in this record to show that statutory mandates or due process requirements with respect to notice and hearing were met before Dennis was found in contempt and sent to jail.

At the hearing held on October 22, 1981, when Dennis was held in contempt of court, the district attorney for the first time asked that Dennis be found in contempt and jailed for his failure to comply with the court's orders. On January 25, 1980, an order to show cause was issued as to why the defendant should not be held in contempt; however, that order to show cause was dismissed with prejudice. There was also a paragraph in the divorce judgment dated April 27, 1981, which stated: "Disobedience of the provisions of this Judgment with respect to payment of . . . child support . . . is punishable under chapter 785 Stats., by commitment to the County Jail . . . until such judgment is complied with . . . ."

This was a general notice to both parties that the court has authority to make sure its orders are carried out.

Before a party can be held in contempt for failure to provide court ordered support, sec. 767.305, Stats., requires that the party be given notice and a hearing and "the court may on its own initiative, and shall on the application of the receiving party, *issue an order requiring the payer to show cause* . . . why he or she should not be punished for such misconduct as provided in ch. 785." (Emphasis added.) Neither that statutory provision nor sec. 785.03, governing remedial sanction, when read together require a formal written notice or order to show cause for the court on its own initiative to schedule a contempt hearing, as long as it is done on the record in the defendant's presence. If the trial judge in this case had given notice orally from the bench on the record at the court hearings preceding October 22, 1981, that on the October 22 date the court would be considering the defendant's compliance with the court's orders to seek work and to comply with support payments with contempt as a potential alternative if noncompliance, that would have been notice and would have satisfied the need of due process and the statutory requirement. There is nothing in this record to show any formal notice of a contempt hearing being served on the defendant, nor any order of the judge that such hearing would be conducted. The statutory requirements and due process require that the defendant be aware of what he must answer to so that he can be prepared to offer proof and explanation showing his good faith efforts to comply with the court's orders.

In *O'Connor v. O'Connor*, 48 Wis. 2d 535, 543, 180 N.W.2d 735 (1970), we held: "Due process requires at least a notice and a hearing in the contempt process, whether the proceeding is under statutory authority or

is an exercise of the inherent power of the court to enforce its order by an in personam remedy."

This record reveals that Dennis was never put on notice that the October 22 hearing was for the purpose of determining whether he was in contempt for either failure to seek work or failure to provide support.

The case is sent back to the trial court to conduct a contempt hearing to determine whether the defendant has complied with the court's orders to seek work and make the support payments or if he has failed to comply after good faith efforts. The defendant, with notice as to the purpose of the hearing, may present evidence and after proof is received, the trial court must determine whether the defendant should be held in contempt for contumacious disregard of the court's orders or whether the defendant has substantially complied with them.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded for further proceedings consistent with this opinion.

DAY, J. (concurring). I concur with the majority opinion and write for the purpose of stating that the conclusions reached by Justice Abrahamson in her concurrence which attempts to justify this defendant father's failure to support his family are not and should not be the law in this state.

Justice Abrahamson suggests that the "seek-work" order in this case "raises questions of due process, equal protection and involuntary servitude." (Abrahamson, J. concurrence, *infra,* p. 275).

The public might well wonder by what legal legerdemain one can equate a court order "directing [a] parent to take alternative employment" to support his children to "involuntary servitude." (Abrahamson, J. concurrence, *infra,* p. 275).

The phrase comes from the anti-slavery thirteenth amendment to the United States Constitution passed following the Civil War. It provides:

"Article XIII. Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

The Wisconsin Constitution provides in Article I, section 2:

"**Slavery prohibited.** There shall be neither slavery, nor involuntary servitude in this state, otherwise than for the punishment of crime, whereof the party shall have been duly convicted."

To compare the enforcement of the obligation of a parent to support a child with slavery lacks appreciation for the social desirability of the former and the social monstrousness of the latter.

It is clear that under Wisconsin law the receipt of state relief may be conditioned on the recipient's willingness to work. Section 49.05(1), Stats. 1981–82, states:

"**49.05 Work relief.** (1) Any municipality or county required by law to administer relief may require persons entitled to relief to labor on any work relief project authorized and sponsored by the municipality or county, at work which they are capable of performing. . . ."

Section 49.50(7)(a) (Act 27, sec. 1075, 1983 Regular Session) makes participation in a work incentives demonstration (WIN-DEMO) program a condition for receipt of aid to families with dependent children.

"49.50(7) WORK INCENTIVE DEMONSTRATION PROGRAM. (a) The department shall ensure that all appropriate individuals so required by federal law and regulations as a condition of eligibility for aid to families with dependent children shall register for manpower services,

training and employment under the work incentive demonstration program under 42 USC 645. . . ."

Until July 1, 1983, sec. 49.50(7)(d)1, 1981–82, provided that an unemployed AFDC–U parent registered in the WIN program could be required to accept employment if full time employment paying a wage or salary equal to or greater than the federal minimum wage became available. Since over ninety percent of the AFDC recipients are women, to require them to work while permitting the fathers of their dependent children to ignore their responsibilities would be the rankest kind of discrimination against women.

State law also imposes a specific duty of support on parents of dependent persons. Section 52.01(1)(a), Stats. 1981–82. A parent who deserts or willfully neglects his support obligation may be subject to criminal prosecution. Section 52.05(1), 1981–82, states:

"52.05 **Abandonment; uniform act.** (1) PENALTY. Any person who deserts or willfully neglects or refuses to provide for the support and maintenance of his or her spouse or child under 18 years (legitimate or born out of wedlock) in destitute or necessitous circumstances shall be fined not more than $500 or imprisoned not more than 2 years or both. It is a defense to criminal liability that the person has just cause to desert, willfully neglect or refuse to provide support and maintenance . . . ."

Proof of desertion of one's children in destitute or necessitous circumstances or of neglect or refusal to provide for the support and maintenance of one's children is prima facie evidence that such desertion, neglect or refusal is willful. Section 52.05(6).

This court has already determined that refusal to do "work of a particular kind" can be a "willful" refusal to support one's family and subject such a parent to the penalties of the criminal law. *Zitlow v. State*, 213 Wis. 493, 498, 252 N.W. 358 (1934). In *Zitlow* the defendant,

who was a molder by trade, had lost his job during the depression. Under the county relief program in effect, when a family was in need of assistance the county furnished the needed relief and set up an account in which the head of the family receiving relief was charged with the value of the supplies furnished. When the county had highway or other work available, the heads of families who were on relief were summoned to appear for work. When the defendant Zitlow failed to appear for work as requested, he was prosecuted and convicted of abandonment by a jury. On appeal the defendant argued that he had just cause for refusing to work. He claimed that he could not be punished for refusing to participate in the county relief program where payment was made in part by crediting an account for relief previously furnished. He insisted that he should be paid his full wages in cash and that, considering the conditions of employment, to enforce the statute would be to imprison him for debt and subject him to "involuntary servitude." In upholding the conviction for willful neglect, the court said:

"The term 'willful' as here used involves either a design or intent on the part of the person charged to evade the duties which the law casts upon him by reason of his marriage and parenthood, *or a neglect based upon aversion or disinclination to work generally, or to work of a particular kind.* If, however, the defendant in good faith, but by erroneous process of reasoning, came to the conclusion that the working conditions imposed by the county were oppressive and intolerable, his refusal to work, even though resulting in distress and want on the part of his family, would not be willful in the sense used in the statute. . . . [T]he less substantial and rational the objections of the defendant to the conditions of employment, the more reasonable the conclusion that the refusal to work was actuated by improper motives rather than an objection expressed in good faith to the working conditions." 213 Wis. at 498. (Emphasis added.) See also: *State v. Freiberg,* 35 Wis. 2d 480, 151 N.W.2d 1 (1967).

Section 52.055 authorizes a less severe criminal penalty for a parent who "intentionally" refuses to provide support. That section also provides that "[s]ubstantial failure by the parent or person to provide for the support or maintenance for more than 21 consecutive days immediately prior to the date when complaint is made under this section shall be prima facie evidence of intent. . . ."

The criminal statute also provides for a court order of support that may be imposed in lieu of or in addition to the criminal penalties. Section 52.05 (4), Stats. The determination of the amount of the payments ordered is to be made with regard "to the circumstances, and to the financial ability *or earning capacity* of the defendant. . . ." (Emphasis added.) This clearly demonstrates that a court may take into account a defendant's earning capacity in evaluating his ability to pay and need not defer to the defendant's desire to remain in a job the income from which is grossly inadequate to meet his legal obligations to his family.[1]

---

[1] The New York courts have expressly recognized the propriety of taking into account a person's earning potential in fixing the amount of a support order. In *Porcelain v. Porcelain*, 94 Misc. 2d 891, 405 N.Y.2d 961 (N.Y. Fam. Ct, 1978), the Family Court for Nassau County said:

"The law is well settled that the respondent's present economic condition is not the measure of the proper amount of support for the petitioner and his dependent children, but rather it is his ability to provide—his potential earning power which must be considered. The fact that he does not work, does not, in and of itself, preclude his capacity to work, nor preclude a finding that he has means wherewith to discharge an order for support. *(DeLaFerriere v. DeLaFerriere*, Dom. Rel. Ct., 94 N.Y.S.2d 147). The court is under an affirmative duty to fix an order measured by respondent's ability to earn a living *(De Brauwere v. De Brauwere*, 203 N.Y. 460, 96 N.E. 722). The measure of ability to support is not based upon what an irresponsible husband designs to earn, but what he is potentially able to earn in light of his established capabilities. *(Brandt v. Brandt*, 36 Misc. 2d 901, 233 N.Y.S.2d 993; *Diana L. v. State of New York*, 70 Misc. 2d 660, 335 N.Y.S.2d 3.).'' 94 Misc. 2d at 895, 405 N.Y.2d at 964.

In justification for doing nothing to make this father support his children, Justice Abrahamson speculates: "I wonder what the prospects for job stability are, considering his employment history and that he is being forced to work *at a job he does not want.*" (Abrahamson, J. concurrence, *infra,* p. 276). One might also speculate on how this mother will finish raising these children at the low economic level of public relief, or on how these children's lives will be affected by knowing they are public charges, living without things other children take for granted, and knowing their father refuses to support them. Such speculation admittedly is less pleasant than "wondering" about a father "forced to work at a job he does not want," but it has infinitely greater social consequences.

There are countless men and women "forced to work at a job [they] do . . . not want," jobs that require long hours of hard, boring, often dangerous labor, in unpleasant surroundings, "forced" because they have children, spouses or parents looking to them for support. They do not look upon their jobs as "involuntary servitude." They might, however, feel that the tax bite taken out of their wages to support the families of the able bodied who prefer to let the taxpayers bear their burdens approaches *a form of "servitude"* they should not be asked to endure.

I am authorized to state that JUSTICE WILLIAM G. CALLOW joins in this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (concurring). The circuit court ordered the father to pay $5 per child per month for child support—a mere $15 per month, clearly not enough to support one child, let alone three. The father failed to pay $15 per month and offered no justification for his nonpayment. The circuit court would be justified in holding this father in contempt if, after

proper notice and opportunity to be heard, the father failed to show cause why he should not be punished.

Child support—or, I should say, child nonsupport—is a major problem in society today. This state has been a leader in legislation, court decisions, and scholarly research on the issue of fair and adequate child support awards and their implementation. *See, e.g.,* Melli, *Child Support Awards: A Study of the Exercise of Judicial Discretion* (University of Wisconsin Institute for Research on Poverty Discussion Paper 734–83, November 1983) ; Tewksbury, *Our Child Nonsupport System,* Wis. J. Fam. Law 52 (Dec. 1983) ; Zink, *Wisconsin Child Support Standards,* Wis. J. Fam. Law 37 (Dec. 1983).[1]

Studies have shown that child nonsupport is a significant cause of the poverty of women and children. Unfortunately in too many cases there is a "very high incidence of nonsupport of legitimate children by affluent fathers, some of whom were professionals with six-figure incomes. These affluent fathers were rarely prosecuted . . . with any intensity. Therefore, many of the women and children became public charges while fathers were relieved of the burden of support." Tewksbury, *Our Child Nonsupport System,* Wis. J. Fam. Law 52 (Dec. 1983) 53.[2] As a result of small awards of child support and poor enforcement of child support orders, divorced women in the United States bear a far greater burden of supporting children after divorce than do divorced men. Many households headed by mothers after divorce are far less affluent than the new households of divorced

---

[1] *See also* Eckhardt, "Social Change, Legal Controls, & Child Support: A Study in the Sociology of Law" (Ph.D. thesis, 1965), quoted in Mnookin, *Using Jail for Child Support Enforcement,* 48 U. Chi. L. Rev. 338 (1981).

[2] *See* Winston and Forsbar, *Nonsupport of Legitimate Children by Affluent Fathers as a Cause of Poverty and Welfare Dependence* (Rand Corp. 1971), quoted in S. Rep. No. 93–1356, 93d Cong. 2d Sess. in 1974 U.S. Code Cong. & Ad. News 8133, 8146.

fathers. Weitzman, *The Economics of Divorce: Social and Economic Consequences of Property, Alimony, & Child Support Awards,* 28 U.C.L.A. L. Rev. 1181 (1981).

This case presents issues somewhat different from other child support cases, since both the husband and the wife are subsisting below the poverty line. In this case the supporting parent, the father, earned very little per month, both before and after the divorce. Before the divorce proceedings, the father's income apparently was sufficient to support the family without government assistance; after the divorce proceedings began, the same income was insufficient to support two family units without government assistance for one unit, in this case the unit composed of the mother and children. While I concur in the court's decision, I have several reservations about the court's analysis of the issues involved in this case.

First, unlike the majority, I think the circuit court has to issue a written order requiring a parent to show cause (at a date and time and place specified therein) why he or she should not be punished for the misconduct described in the order. The requirement that the order be written is implicit in secs. 767.305 and 785.03(1)(a), Stats. 1981–82, the nature of a contempt procedure, and due process guarantees. The requirement that the order be in writing is explicitly set forth in sec. 807.11, 1981–82. Sec. 807.11(1) states that "an order is rendered when it is signed by the judge." Sec. 807.11(2) states that "an order is entered when it is filed in the office of the clerk of court." An order cannot be signed or filed unless it is in writing.

Second, I am uneasy with the majority's characterization of the circuit court's order as a "seek-work order" issued for the purpose of enabling the trial court "to make an accurate and informed finding as to the defend-

ant's ability to earn and what his worth is economically."
*Supra,* p. 257.

The majority says the trial court was issuing a "seek-work order" to determine whether other jobs were available to the father and if so how much he could be expected to earn in such jobs so that the trial court could evaluate whether he was diligent or whether he was wilfully disregarding his support obligations. To validate this kind of order the majority relies on dictum in *Edwards, supra,* 97 Wis. 2d at 120. *See supra,* p. 258. I agree that under the *Edwards* dictum the trial court may issue a reasonable seek-work order to gather information about the income of the supporting parent in order to enter an appropriate support order. But I am concerned that this trial court order does not comport with the *Edwards* dictum in several respects.

*Edwards* speaks about examining job opportunities in the same profession in which the parent is trained. Yet the order in this case requires the father to seek employment generally. An order designed to help the trial court ascertain whether the father was fulfilling his earning capacity through diligent work in his chosen trade should have been more narrowly drawn than this order.

*Edwards* speaks in terms of giving a parent a fair choice of a means of livelihood subject to reasonableness commensurate with obligations. The order in this case was not specifically designed to determine "fair choice" or "reasonableness." Prior to issuing the order, it appears from the record that the trial court may have concluded that the father had had enough time to make a "go" of work in the car repair field and that his fair choice had been used up.

In any event, the trial court's order may not be a "seek-work order" for the purpose of information gathering, as the majority says, but an order that the father abandon his occupation and get a different job. The trial court

may have been issuing an "abandon your occupation and take a different job order" enforceable by having the father report to the court periodically on his efforts in seeking work. Several parts of the record could be so read. Although the majority is correct in saying the trial court never ordered the father to take a specific job, it did order the father not to refuse "any job which he is physically able to do, even if the job is not in his chosen trade or occupation, or is not full-time, or pays less than the pay he is used to, or is temporary." *Supra,* p. 256 and n. 4.[3] That the trial court was not merely seeking information to evaluate the father's diligence and earning capacity but wanted the father to get a job that would net him more than $300 per month can be inferred from some parts of the court's colloquy with counsel.[4]

---

[3] The court says it will not consider this aspect of the order.

[4] "THE COURT: Mr. Thexton [district attorney], suppose I had an erstwhile mechanic poet who in eleven years never sold a poem. If he sold two thousand poems would this Court be acting with responsibility if it allows him to write unsalable poetry for the rest of his life and to allow his children to listen to the poetry being read and not get any support?

"MR. THEXTON: Certainly not. I guess I thought that was the point I was trying to make. This man can continue to work as a mechanic and as far as I am concerned he can continue to have his own shop, but he can't do it full-time. In addition to finding something that he can work out and—

"THE COURT: Just because he is a poet and just because on occasion he sells poetry and just because in eleven years he hasn't done that, does that mean that a responsible society ought to wait until somehow through an act of God or some other deity infused with Shakespearean propensity and ability and starts to turn out best sellers—that's preposterous.

"MR. ERSPAMER [defense counsel]: Your Honor, may I address that briefly?

"MR. THEXTON: I think that further argument on my part would be repetitious. This man has put his best years into this shop. I think the Court could find and did find that eleven years was long enough to determine whether he was fulfilling the Ed-

If the trial court's order were interpreted as not merely information gathering but as requiring the father to get another job, the order may not be within the trial court's discretion under the rules set forth by this court in *Knutson v. Knutson,* 15 Wis. 2d 115, 118, 111 N.W.2d 905 (1961); *Balaam v. Balaam,* 52 Wis. 2d 20, 187 N.W. 2d 867 (1971), and most recently in *Edwards v. Edwards,*

wards criteria of trying to make his business profitable. We have determined that the business is not profitable. He's been given his fair shot and I think the Court acted well within its discretion ordering him to seek other routes.

"THE COURT: That's the ultimate point. That is all the Court did. I didn't tell him he should go out and go to work for the Indianapolis 500 pit crew. I didn't tell him that he has to take the first job that he is able to get. All I did was order him to do something to get alternative employment. There was allegation that was an oppressive order: unfair of him to go to ten other places per month. . . ."

". . .

"MR. ERSPAMER: I refer the Court to the next paragraph [in the *Edwards* case] referring to Balaam [case]. 'Opportunity to have a fair choice of his own type of income.'

"THE COURT: He has had it. He has had eleven years. What I have ordered him to do is to take some steps that will enable him hopefully to do better by himself and better by his children. I have concluded that and Mr. Thexton is correct in making the point that eleven years is enough time to deduce that he isn't going to cut it.

"MR. ERSPAMER: Eleven years of safe income. It's quite obviously apparent that it's likely his income is going to increase.

'THE COURT: He isn't improving himself.

". . .

"THE COURT: . . . how long society is supposed to wait for somebody to get it through his or her head that your best efforts or what you imagine to be your best efforts aren't good enough.

"MR. ERSPAMER: . . . There was no intentional disregard of his obligation, to shirk his responsibility. This man worked forty hours a week.

"THE COURT: If there had been, counsel, you would have gotten a different order; gotten an order commensurate with the needs of those children."

97 Wis. 2d 111, 293 N.W.2d 160 (1980). *Knutson, Balaam,* and *Edwards* lay down the following rules for the trial court in issuing a support order:

(1) The award of child support is within the discretion of the trial court.

(2) Support money is fixed on the basis of the needs of the children and the ability of the parent to pay.

(3) The parent's ability to pay is determined by income, assets, debts, age, and health. These determinations are made upon the basis of the circumstances existing at the time of the support order.

(4) If the supporting parent is honestly engaged in a business to which the parent is properly adapted and is in fact seeking to operate the business profitably, the award should be based on the income which the defendant is actually earning.

(5) If there is a finding based on evidence that the parent was failing to exercise his or her capacity to earn because the parent is not fairly or diligently working at the occupation for which he or she is best suited or because the parent has willfully accepted employment and resultant lower compensation in order to reduce the ability to pay child support, the court may use as the basis for its award earning capacity rather than current income.

(6) A divorced parent should be allowed a fair choice of a means of livelihood and to pursue what he or she honestly feels are the best opportunities even though the parent for the present, at least, is working for a lesser financial return than might otherwise be possible. This rule is subject to reasonableness commensurate with obligations to the child.

(7) A court should not assume that a parent has an earning capacity equal to the minimum wage. The individual equities of each case must be examined. Many

people cannot find well-paying jobs for reasons beyond their control.

Under these rules, the support order must be based on the actual earnings, $300 per month, unless the trial court finds that the father was not fairly or diligently working at an occupation for which he is best suited or that he has willfully accepted employment and lowered compensation in order to reduce the ability to pay child support. There is no evidence in this record to support such a finding. To the contrary, the record indicates that the father was diligent, that he was working at the job for which he was trained, and that his income in his chosen trade has remained stable over many years. Under these circumstances the trial court appropriately based its support order on the father's actual income. For the trial court under these circumstances to order the father to change his trade so as to increase his income so that the trial court can increase the support order may be a clear abuse of discretion under the teachings of these cases.

By characterizing the trial court's order as a seek-work order, this court need not decide whether a trial court may order a parent to abandon his or her occupation and take a new job when the trial court finds that the parent is diligent, is working in good faith, and is not willfully shirking his or her support obligations but that the children are receiving government assistance and the supporting parent is earning less than the court thinks might be earned at a different kind of job.[5] I am concerned that an "abandon your occupation and take a different

---

[5] It may be that the state could have proved, without this seek-work order, that the father was not diligent or was wilfully shirking his support obligations or that the father had unreported income. The court of appeals inferred from the record that "Dennis' contempt was wilful because he has undisclosed income." The trial court never made such a finding and neither has the majority.

job" order under such circumstances would be an abuse of discretion.

As a matter of constitutional law, strict standards must be met before the highly protected freedom from compulsory work can be infringed. Without a finding of willfulness or lack of diligence an order directing the supporting parent to take alternative employment raises questions of due process, equal protection, and involuntary servitude. An awareness of such problems is shown in the following comment in *Edwards* concerning the requirement of a finding of intent to disregard support obligations and contempt:

"One justification for the requirement in *Balaam* that there must be a finding of intent to disregard support obligations before earning capacity rather than actual earnings can be used to determine the spouse's ability to pay child support is found in the law of contempt. Mere inability to pay child support cannot form the basis for a finding of contempt:

" '. . . it has long been settled in Wisconsin that a person cannot be held in contempt of court for the failure to pay money unless the refusal is willful and contemptuous and not a result of his inability to pay.' *Balaam, supra,* 52 Wis. 2d at 29; quoted with approval, *Besaw v. Besaw,* 89 Wis. 2d 509, 516, 279 N.W.2d 192 (1979)." *Edwards, supra,* 97 Wis. 2d at 119–20, n. 4.

As to the reasonableness of such an order, I wonder whether a man in this father's situation is likely to find a much better-paying job than his current one. He is 43 years old; he does not have a high school diploma; he has had 20 years' experience in the car repair business and has had no other job experience; he is accustomed to operating his own business; his compensation has been at the same level for a number of years; and he is earning $3,600 a year, the most he has ever earned. And even if he is successful in finding a job, I wonder what the prospects for job stability are, considering his employ-

ment history and his being forced to work at a job he does not want. With these reservations, I concur in the holding.

LOUIS J. CECI, J. (dissenting). I dissent from the majority view in this case because a clear reading of the entire record indicates to me a defendant who clearly does not wish to exert himself in any respect for purposes of supporting his children.

The order of support entered by the circuit court was that this defendant pay $15 per month total support for three children. The order further required this defendant to pay $5 per month total on the arrearages accumulated up to that time.

The record further indicates that during this period of nearly zero effort by this defendant, he was able to trade off repair work for a membership in the golf country club, which was valued at $100. Had the defendant truly been making *any* effort to support his three children, he could have used the $100 for the purpose of paying all of the support the court had ordered for a period of five months and all of the amounts ordered to be paid on the arrearages for a period of five months. Instead, this defendant chose to trade off his labor and efforts so that he could go golfing.

A reading of the entire record indicates, to me at least, that this defendant was totally satisfied that the taxpayers were supporting his three children. My reading of the record indicates an individual who just did not care to comply with the court's orders. I would affirm.