STATE of Wisconsin, Plaintiff-Respondent-
Petitioner,

v.

John F. FRIDAY, Defendant-Appellant.

Supreme Court

*No. 86–1484–CR. Argued September 7, 1988.—Decided January
11, 1989.*

(Also reported in 434 N.W.2d 85.)

360

For the plaintiff-respondent-petitioner the cause was argued by *Sharon Ruhly,* assistant attorney general, with whom on the briefs were *Barry M. Levenson,* assistant attorney general, and *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief by *James J. Ewers* and *Ewers Law Office;* and *Bonnie S. Musial* and *Musial Law Office,* all of Madison, and oral argument by *James J. Ewers.*

HEFFERNAN, CHIEF JUSTICE. This is a review of a decision[1] of the court of appeals which reversed the conviction of John F. Friday by the circuit court for Dane county, George R. W. Northrup, circuit judge. We reverse the court of appeals because, unlike the court of appeals, we conclude, on undisputed facts, that there was probable cause for the seizure and for the search of the automobile of the defendant, John F. Friday.

John F. Friday was arrested, charged, and convicted of two counts of possession of controlled substances, marijuana and cocaine. His only defense, proffered in motions to suppress evidence, was that the contraband was obtained by an illegal seizure and an illegal search.

After his motions to suppress were denied, Friday entered a plea of no contest to both counts of possession with intent to deliver, contrary to sec. 161.41(1m)(b), Stats. Sentence was withheld, and Friday was placed on three years concurrent probation on each count. A fine was imposed, but all sentences were stayed pending appeal.

The court of appeals reversed, holding that the warrantless search was illegal and the evidence produced by the search should have been suppressed. Because the court of appeals concluded that the search was not based on probable cause, it declined to determine whether the initial seizure of defendant's automobile was illegal (see State v. Friday, 140 Wis. 2d at 704, n. 1) and, in any event, the fruits of the search were subject to suppression.

[1]State v. Friday, 140 Wis. 2d 701, 412 N.W.2d 540 (Ct. App. 1987).

The state has urged that we decide whether the "reasonable suspicion" standard, first stated in *Terry v. Ohio*, 392 U.S. 1 (1968), would have justified the seizure of the automobile. Because the undisputed facts and the reasonable inferences drawn here without a doubt demonstrated probable cause for the warrantless seizure, we decline to explore any possible alternative justification. We do not decide whether a police officer who has a reasonable suspicion that a motor vehicle contains contraband may "seize" (as opposed to "stop," as in *State v. Guzy*, 139 Wis. 2d 663, 407 N.W.2d 548 (1987)) the vehicle without first securing a warrant.

The facts of record are lengthy, but because this court is called upon to evaluate probable cause under the circumstances, it is necessary to recount them in detail. The basic facts are undisputed. It is the inferences drawn from the facts that are disputed. Friday's counsel at oral argument repeatedly stated that the inference of drug dealing had to be incorrect, because it was inconceivable that persons actually dealing in drugs would have blatantly revealed their purpose in the presence of known narcotics officers.[2] True, there is evidence of record of overt and bumbling conduct that clearly revealed the suspected person's drug dealing to the police. This was indeed *"The Gang That Couldn't Shoot Straight."*[3] Ineptness in criminal conduct is not, however, an index of

[2] The words of Attorney Ewers at oral argument were, "I find it incredible to believe that, if in fact Mr. Friday was cognizant of the fact that there were members of the narcotics vice squad sitting in his close proximity, that he would in fact be dealing drugs before their very nose."

[3] Jimmy Breslin, *The Gang That Couldn't Shoot Straight*, Viking Press, 1969.

innocence. On the contrary, it furnished the basis for probable cause to seize Friday's vehicle and subsequently to search it.

The facts are that, on the evening of October 25, 1983, four police officers—Dandurand, Klubertanz, Topp, and Rickey—apparently in plain clothes and members of the intra-county narcotics squad, went to Stevens restaurant and bar in the City of Madison for no purpose other than to have dinner. At about 6:30 p.m. John Friday entered the bar with a woman. Officer Dandurand recognized Friday because of information acquired during prior drug investigations. On the basis of this information, Dandurand believed that Friday used a beeper and used telephone communications to sell cocaine. Dandurand decided that the officers should stay in the restaurant to observe Friday's conduct. Shortly thereafter, a person, later identified as Tim Gearhardt, talked to Friday. During this conversation, Dandurand noted that Friday was receiving messages on his beeper and was making numerous telephone calls. Dandurand observed that Friday noticed his presence in the bar and was of the opinion that Friday recognized him from previous encounters in which Dandurand had arrested persons who were with Friday.

A person whom Dandurand recognized as Friday's brother Vaughn then arrived at the bar. Friday pointed out Dandurand to Gearhardt and Vaughn, Dandurand was close enough to hear Friday say, "We have had problems." It appeared to Dandurand that Friday became increasingly nervous. At about 7:00 p.m., two brothers, Jeff and Stef Kundert, whom Dandurand recognized as having been arrested previously for drug violations, entered the bar and spoke to Friday. While doing so, they turned and looked at

364

Dandurand. A short time later, Jeff Kundert and Friday left the bar together, followed out by Dandurand. Dandurand saw that Friday was nervously looking over his shoulder. The two, Jeff Kundert and Friday proceeded only a short distance and then returned to the bar. As Friday entered, he accosted Dandurand and asked what he did for a living, Dandurand answered, "As little as possible." The state uses this encounter to demonstrate that Friday knew Dandurand. The defense argues that the incident shows Friday did not know the officer. Friday and Jeff Kundert remained in the bar for a short time and then, followed by Dandurand, left. Dandurand saw the two drive away. They, however, reentered the bar five minutes later.

Shortly thereafter, Dandurand confronted both Kunderts as they were leaving the bar. Dandurand identified himself as a police officer and told them he believed drugs were being dealt in the bar, and he asked to talk to them and to Friday. Stef Kundert left at once. Jeff Kundert produced identification and stated that he knew why Dandurand was watching Friday, but that Friday was no longer selling and that Dandurand was just harassing Friday. Jeff Kundert said he was not involved. Jeff Kundert and Dandurand reentered the bar; and, in Friday's presence, Jeff Kundert again stated Dandurand was harassing Friday. At about this time, Dandurand heard Friday say on the telephone, "Jim, you have to get down here right away, there is problems."[4]

At about 8 p.m., Dandurand saw Friday speaking to Linda Stevens, the co-owner and manager of the

---

[4]Subsequent information in the record indicates that the call was to Friday's attorney.

establishment. He saw Stevens shake her head. Stevens then indicated to Officer Topp that she wished to talk to him. Officer Topp approached Stevens, and she told him that Friday had the bag that his brother Vaughn had been carrying and Friday had asked her to take the bag into the kitchen area. Stevens told Topp that she knew what was going on and that there were drugs in the bag and that was why Friday asked her to get rid of it.

At about this time, Gearhardt walked out to the parking lot. He was followed by Dandurand, who there identified himself as a police officer. Dandurand testified that Gearhardt said that Friday was involved with drugs and he knew that was why Dandurand was watching Friday. Gearhardt denied, however, that he had anything to do with drugs. He stated that Friday's attorney was on his way.

Soon thereafter, a person known to Dandurand to be Dino Corti entered the bar and talked with Friday. Corti looked around and appeared to recognize the officers. He knew Dandurand, Klubertanz, and Topp and knew they were police officers. Upon spotting the police officers, Corti left the bar by the rear entrance. Dandurand directed Klubertanz to follow Corti. Then Friday looked over at Dandurand and said, "Well, dammit, if you're going to bust me, bust me."

Officer Klubertanz testified that, when she followed Corti out of the bar at about 8:15 p.m., she saw him unhooking a grey or silver Mustang from the tow chain on Corti's tow truck. Klubertanz quickly ran a license check on the vehicle and found it was registered to Friday.

It was only then that the vice squad officers knew that Friday owned the Mustang.

Klubertanz and Corti talked in the parking lot. Who initiated the conversation is not clear, but, as Klubertanz approached, Corti said, "I don't want to have anything to do with this mess." Klubertanz then asked whether Friday had called Corti to tow the car away. Corti responded, "Yeah, Friday wants me to tow this car. There is dope in there, I don't want anything to do with this." Corti got into his tow truck and drove away.

Klubertanz recounted this incident to Dandurand. He instructed her to stay with the Friday vehicle. Shortly thereafter, Friday left the bar area and was followed outside by Officers Topp and Dandurand. Dandurand identified himself as a police officer and told Friday that he believed there were drugs in the Mustang and that it was being held to get a search warrant. Dandurand told Friday that he was free to leave but the vehicle was being detained.

Dandurand testified that, at this time, he believed he had probable cause to seize the vehicle. It was agreed at oral argument that the "seizure" of the vehicle took place when Friday was told that the vehicle was being held and from then on was guarded by police officers.

Following the car seizure, Friday's brother Vaughn was arrested in the bar. A search of the bag that Vaughn was carrying disclosed a quantity of marijuana.

While Vaughn was being arrested, Topp and Klubertanz identified themselves to Friday in the parking lot and told him that the car was not to be entered or moved. Friday returned to the bar, and shortly thereafter a woman emerged, who told the officers that she owned the car and was going to drive it away. Klubertanz told her she could not, that the

367

car belonged to Friday and was being detained by the police. Klubertanz asked for the woman's identification. Then Friday came out of the bar, keys in hand, and shouted, "Don't tell them anything." He said he was going to move the car and that they would have to stop him forcibly. A struggle ensued. Topp and Klubertanz subdued and handcuffed Friday. Friday was then arrested for obstructing an officer.

Two more officers then arrived at the scene. One of them, Officer Pieper, reported that Corti had called headquarters stating that he had been asked to tow Friday's car but he refused to do so because he knew Friday had cocaine in the vehicle. At this point, Friday was also arrested for possessing cocaine with the intent to deliver.

The car was entered with the keys that had been dropped by Friday. Seven vials of white powder, later determined to be cocaine, were found under the floor mat. A locked tool box was also found, which, when opened, was found to contain more cocaine and several pounds of marijuana. The total cocaine seized totalled 31.5 grams.

Friday's motions to suppress the evidence because of an illegal search were denied initially by Judge Edward Marion, and on reconsideration by Judge George Northrup. Neither of the suppression judges specifically addressed the question of whether there was a reasonable basis to undertake the warrantless seizure as contrasted to the warrantless search.

Corti's statement is an essential link in the state's case, for, until Officer Klubertanz followed Corti out of the bar and identified the ownership of the car that Corti had been asked to tow away, there was nothing to associate the events in the bar with the vehicle; and

it was Corti, who, after talking to Friday, told Officer Klubertanz that there was "dope" in the car.

Defense counsel argued to Judge Marion, as he did in this court, that Dino Corti was known by the police to be an unreliable police informant—it is uncontradicted that, on a prior occasion, as a witness, he recanted information he had provided the police. Judge Marion pointed out, however, that Corti on other occasions had in fact furnished reliable information. He also stated, significantly, that this was not an unidentified informant, but one whose information could be relied upon in the "context" of the other information known to the police.

On reconsideration, Judge Northrup reached the same conclusion, treating Corti as an informant whose testimony reinforced the reliability of the observations and conclusions of the police officers at the scene. Judge Northrup, using the terminology of *State v. Paszek,* 50 Wis. 2d 619, 630, 184 N.W.2d 836 (1971), specifically stated Corti was a "citizen informant," not a police informant.

At the time of Friday's conviction, a search of a vehicle without a warrant required "exigent circumstances," as well as probable cause. Hence, the focus of both suppression judges was, in part, on the question of exigency—an issue that is not controlling since this court's decision in *State v. Tompkins,* 144 Wis. 2d 116, 423 N.W.2d 823 (1988), which held that an automobile could be seized and searched on probable cause alone and that there need be no showing of exigent circumstances.

The court of appeals' decision, which we review, in this case correctly determined that the crucial fact was Corti's statement that there was "dope" in the car. The court of appeals errs factually, however,

when it states, "The only connection between drugs and the car was Pieper's statement [a statement made after Friday's arrest] that Corti had said there were drugs in the car." 140 Wis. 2d at 710. The majority opinion overlooks its own recitation of the fact that Corti made the same statement to Klubertanz prior to the seizure of the car. 140 Wis. 2d at 706. Also, the court of appeals said in its opinion that, "We are unwilling to 'infer' any suspected drugs from the restaurant into the car." 140 Wis. 2d at 709–10. While the meaning of this sentence is somewhat obscure, it apparently is intended to say that the court of appeals was declining to give credence to the uncontradicted facts and to accept the inference reached by the trial court that the conversation that Corti had with Friday, either over the phone when he was called to tow the car or when he arrived in the bar, disclosed that there were drugs in the car. The trial judge could have drawn different but reasonable inferences from the uncontradicted facts. One reasonable inference was that Corti's observed conversation with Friday provided the information that drugs were in the car. The trial judge, as finder of fact, reasonably could have rejected that finding and inferred that no such information was provided by the conversation. The trial judge, as a matter of fact, drew the inference that the conversation with Friday was the source of Corti's information.

The drawing of an inference on undisputed facts when more than one inference is possible is a finding of fact which is binding upon an appellate court. It is not within the province of this court or any appellate court to choose not to accept an inference drawn by a factfinder when the inference drawn is a reasonable

one. *Onalaska Electrical Heating, Inc. v. Schaller,* 94 Wis. 2d 493, 501, 288 N.W.2d 829 (1980); *Kessler v. Industrial Comm.,* 27 Wis. 2d 398, 400, 134 N.W.2d 412 (1965). Thus, the inferential finding of the suppression judges was not a legal determination to be addressed *de novo* by the court of appeals, but was a finding of fact, to which full deference must be accorded unless the inference was clearly unreasonable.

The police officers on the scene also drew the inference that Corti's knowledge was the result of Friday's communication with Corti—a conversation in the presence of the officers. That it is this inference—an inference that is not unreasonable—to which the court of appeals refused to give deference is demonstrated by its statement, "While it might be inferred that Corti's knowledge was the result of his conversation with Friday, we do not choose to draw such an inference in a case where the declarant is a known police informant of questionable reliability." 140 Wis. 2d at 711–12.

Thus, the court of appeals failed properly to defer to a fact finding of the trial court and also based its conclusion on its characterization of Corti as a "police informant," a characterization not applied to Corti by the trial judges. We conclude that Judge Gartzke's dissent explains the reasonableness of the inference drawn by the suppression judges, *i.e.,* that, in view of all the circumstances, Corti was not to be regarded as a police informant, but rather as one whom the police clearly and unmistakably knew to have been in a physical location and in circumstances to enable him to give fully reliable information to the police. The fact that one has once been a police informant does not for all time so categorize the person or relegate the

person to that status if in a particular case he is more than a mere "tipster," but rather is one who is known to be so situated as to acquire and relay reliable information. Judge Gartzke, in his dissent to the court of appeals decision, well states the crucial difference:

> Because Corti had been a police informant, the majority concludes that his statements to the police require greater proof of reliability than those of ordinary citizens. Since Corti did not tell Klubertanz or Pieper why he believed that Friday's car contained drugs, the majority states that the officers could not be sure that the information was not based on casual rumor or Friday's general reputation.
>
> The sequence of events leads to a reasonable inference, however, that Corti obtained the information concerning the drugs when he talked to Friday and that his information was therefore reliable. Corti had been called to tow a car, he drove to the restaurant and hooked the car to his truck. After his conversation with Friday, Corti unhooked the car, told police there were drugs in it, and left.
>
> The majority overstates the importance of Corti's having been a police informant. It does not follow that every time a police informant talks to the police he acts in that capacity. The distinction between a citizen informer and a police informer when testing reliability for probable cause is whether the informer has an expectation of some gain or concession in exchange for the information. *Loveday v. State,* 74 Wis. 2d 503, 524, 247 N.W.2d 116, 128 (1976). It is the expectation or concession which renders suspect information supplied by a police informant.
>
> The record contains no evidence or basis for the inference that Corti expected some gain or

concession in exchange for Corti's information. Corti's critical statement was to Officer Klubertanz. Corti made the statement in response to Klubertanz' asking whether Friday had called him. Corti was not acting as a police informant when he told Klubertanz that Friday wanted the car towed, that there was dope in it and that Corti did not want anything to do with it. Consequently, the police had no reason to doubt the reliability of Corti's two statements that Friday's car had dope in it.

140 Wis. 2d at 718–20.

We conclude that, in the circumstances, the court of appeals erred in excising the Corti statement from the probable cause equation. Thus, the question presented, in light of the reliability that should be afforded to the Corti statement, is: Was there probable cause for the seizure of the vehicle which took place when Officer Dandurand told Friday that he was free to leave but the car would be detained for the purpose of getting a search warrant.

Article I, sec. 11, of the Wisconsin Constitution and the fourth amendment to the United States Constitution prohibit unreasonable searches and seizures. They provide:

> Searches and Seizures. Section 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Wisconsin Constitution.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

United States Constitution.

■

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In *United States v. Place*, 462 U.S. 696, 707 (1983), Justice O'Connor wrote:

> There is no doubt that the agents made a "seizure" of Place's luggage for purposes of the Fourth Amendment when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage to a federal judge to secure issuance of a warrant.

■

Nor can there be doubt that Officer Dandurand "seized" Friday's car for the purposes of the fourth amendment analysis when Officer Dandurand told Friday that the police would be holding Friday's vehicle while they applied for a search warrant. Although the police did not immediately physically remove Friday's vehicle, Friday was unambiguously told that he would not be allowed to enter or move it. He was, in fact, arrested when he attempted to do so.

Although the fourth amendment is usually challenged in the context of searches rather than seizures, the United States Supreme Court has written:

374

> In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.

*Place,* 462 U.S. at 701.

Wisconsin's Constitution is in accord. In usual situations, "[w]ithout probable cause neither a warrant nor warrantless search would be appropriate." *State v. Tompkins,* 144 Wis. 2d at 122. Under either the United States Constitution or the Wisconsin Constitution, a seizure of personal property is permitted on probable cause.

The "automobile exception" does not abrogate the need for fourth amendment analysis, although seizure of automobiles may implicate different interests than those involved in the seizure of other personal property. "The automobile exception allows a warrantless search and seizure of a car so long as the search is justified by probable cause." *United States v. Rivera,* 825 F.2d 152, 158 (7th Cir. 1987); *State v. Tompkins,* 144 Wis. 2d 116, 423 N.W.2d 823 (1988).

In *Tompkins, supra,* this court abandoned the requirement of exigent circumstances for automobile searches and seizures. But the court carefully justified its holding by pointing out that, "[t]he requirement of probable cause for the officer to search an automobile for controlled substances is a strong deterrent to police invasion." 144 Wis. 2d at 135. At page 137, it stated, "evidence obtained will not be admissible in prosecutions unless the officer had probable cause to believe the vehicle contained contraband ...." The

holding of the case was, "that where the police have probable cause to believe that evidence of a crime is in an automobile, a search may be made of the automobile without a search warrant and without a showing of exigent circumstances." 144 Wis. 2d at 137–38. The facts in *Tompkins* demonstrate that there was a reasonable basis to believe that the truck contained contraband. Hence, the immobilization of the truck— its seizure—was pursuant to probable cause.

Under *Tompkins,* probable cause was required for the search, which intruded upon defendant's privacy interests in the instant case. Arguably, Friday's possessory interest in his car impaired by the seizure was lessened by the facts here. The state might well have argued that Friday abandoned his possessory interest in favor of Corti and his tow truck. However, after Corti unhooked the car, Friday reacquired his full possessory interest in his car. His "abandonment" ceased by the time of seizure.

This case presents a fully intrusive, unlimited fourth amendment seizure that to date can be justified by the traditional probable cause standard.[5]

The concept of probable cause is rooted in the text of the Wisconsin and United States Constitutions. There is no shortage of case law defining it. *See State v. Tompkins,* 144 Wis. 2d 116, 124–25, 423 N.W.2d 823 (1988).

The reliability of information is relevant to the determination of probable cause. *State v. Paszek,* 50 Wis. 2d 619, 628, 184 N.W.2d 836 (1971) (applying *Aguilar* and *Spinelli*). However, probable cause re-

---

[5]We reiterate that we do not consider whether in some circumstances a warrantless seizure of an automobile may be justified on the basis of "reasonable suspicion."

quires that, under all the circumstances, there is a fair probability that an item seized contains contraband or evidence of a crime. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Probable cause must be based on all of the circumstances; and in this case there are circumstances, in addition to Corti's statement, on which a reasonable belief that there were drugs in Friday's car could be predicated. First, Friday's invitation to "bust me" in the bar makes sense if, just as the automobile's ownership was being revealed to the police, he wanted to draw suspicion away from the car. But most important are Corti's observed actions prior to his statement. These not only corroborate the statement, but are themselves independent indicators that there were drugs in the car.

Corti entered the bar and talked to Friday. There is a mass of evidence tending to show that Friday was dealing drugs that night in the bar. Corti recognized police officers in the bar and then promptly left. Immediately thereafter he was seen unhooking Friday's car from his tow truck. One could infer from this action, considered alone, that Friday's car was disabled, but in light of the other facts, including Corti's statement, one could also infer that Friday wanted to get rid of his car without doing it himself. There is ample evidence that Friday was nervous and fully aware that there were members of the narcotics squad in the bar. Attempting to get rid of drugs in his car by having it towed away was a reasonable and logical response to the police presence. The court of appeals erred when it ignored Corti's actions and the other facts and instead analyzed probable cause in this case entirely on the reliability of Corti's statement, measured only by his erstwhile status as a police infor-

mant. Labeling someone as a "police informant" or a "citizen informant" is not dispositive. It is apparent Corti was not acting as a classical police informant on the night in question.

Taken together, the activities in the bar, Corti's actions, and the statement by Corti, properly considered as they were by the suppression hearing judges, add up to a fair probability that drugs would be found in Friday's car. There was probable cause for the seizure.

A search is normally subject to the probable cause standard. *Tompkins,* 144 Wis. 2d at 121 ff. The application of the probable cause standard to the warrantless search conducted in this case is not contested. Where the state and the courts below have disagreed is whether the facts of this case add up to the probable cause necessary to justify the search. All the facts that supported a finding of probable cause for the seizure of Friday's care are undiminished in their support of probable cause for the search of that car and in themselves are sufficient to provide probable cause for the search. Additionally, because the seizure itself was based upon probable cause, the police are entitled additionally to rely upon events that occurred after the seizure, but before the search, in determining whether probable cause was present for the search. These events include the attempts by Friday and his girlfriend to remove the car—events that dispelled the alternate inference that the car was disabled—and the receipt of the supplementary information that Corti had called headquarters stating that Friday had told him there were drugs in the car. Bolstered by these additional facts, but even without them, the finding that there was probable cause for

the seizure inevitably leads to the conclusion that there was probable cause for the search of Friday's automobile.

We therefore conclude that probable cause for both the seizure and the search are demonstrated by the record. The order denying the suppression of the evidence revealed by the search should have been affirmed and the conviction allowed to stand. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—Decision reversed.