IN RE the PATERNITY OF C.A.S. AND C.D.S.: W.W.W., Petitioner-Appellant,

v.

M.C.S., Respondent-Respondent,

R.J.S., Third-Party Respondent.

Patience D. ROGGENSACK, Guardian ad Litem for C.A.S. and C.D.S., Petitioner-Respondent,

v.

W.W.W., Respondent-Appellant.

Court of Appeals

*No. 93–0863. Submitted on briefs October 8, 1993.—Decided May 12, 1994.*

(Also reported in 518 N.W.2d 285.)

470

471

472

For the appellant the cause was submitted on the briefs of *Richard J. Auerbach* of *Auerbach & Porter Law Firm* of Madison.

For the respondent-respondent and third-party respondent the cause was submitted on the brief of *Richard J. Podell* of *Richard J. Podell & Associates, S.C.*, of Milwaukee.

For the petitioner-respondent the cause was submitted on the brief of *Patience D. Roggensack* and *Mary Polson Haefer* of *Ross & Stevens, S.C.*, of Madison.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. The principal issue presented in this case is whether the circuit court has either the inherent or statutory power—apart from the "harassment injunction" statute, § 813.125, STATS.—to enjoin the appellant, W.W.W., from having any contact with two minors he believes to be his children, until they reach the age of eighteen. Other issues relate to whether the

children's guardian ad litem, appointed to represent them in a previous action, had standing to seek the injunctions, whether, assuming the court had the authority to enter the injunctions, the evidence supports their issuance and, finally, whether their terms are overly restrictive. We affirm the trial court's orders in their entirety.

## I. Background and Statement of Issues

In 1985, W.W.W. commenced a paternity action seeking a declaration that he is the father of two children born to M.C.S. and her husband, R.J.S. W.W.W. had a sexual relationship with M.C.S. during the period in which both children were conceived.

After protracted litigation, including appeals to this court and the supreme court, the action was dismissed, with prejudice, as not being in the best interest of the children. The supreme court affirmed the dismissal in *In re C.A.S.*, 161 Wis. 2d 1015, 468 N.W.2d 719 (1991).

After the supreme court's decision, W.W.W. began contacting C.D.S. and C.A.S., attempting to convince them that he, not R.J.S., is their biological father. Attorney Patience Roggensack, who had been appointed the children's guardian ad litem in W.W.W.'s earlier paternity action, commenced the instant proceedings seeking to enjoin him from having any further contact with the children.

The trial court granted the guardian's request and issued two injunctions. The first, issued under § 813.125, STATS.,[1] enjoined W.W.W. from having any

---

[1] Section 813.125(4), STATS., authorizes a court to grant an injunction ordering a person to "cease or avoid the harassment of another person." "Harassment" is defined in the law as, among other things, "[e]ngaging in a course of conduct or

direct or indirect contact with the children for a period of two years. The second—which the court said it was issuing under the "statutory and inherent power of the court to enforce its judgment [dismissing W.W.W.'s paternity action] and its continuing jurisdiction over the welfare of the[ ] children under Chapter 767 under the paternity action in which [the court] declared the parental rights of [R.J.S.]"—contains similar restrictions and is to remain in effect until the children reach the age of eighteen.

W.W.W. appeals from the orders issuing the injunctions, arguing: (1) that the guardian ad litem lacked standing to seek the injunctions and improperly instituted the proceedings before the judge who had presided over his earlier paternity action; (2) with respect to the injunction issued under § 813.125, STATS., that the trial court lacked competency to proceed under the statute for failure to comply with applicable time limits for holding the hearing and, alternatively, that the evidence was insufficient to support issuance of the injunction; (3) that the court lacked both "inherent or explicit" authority to issue the "age-eighteen" injunction; and (4) that the injunctions are overbroad. As indicated above, we reject his arguments and affirm the orders.

---

repeatedly committing acts which harass or intimidate another person and which serve no legitimate purpose." Section 813.125 (1)(b). Another related section requires that the "harassment" be done "with intent to harass or intimidate" in order for an injunction to be issued. *See* §§ 813.125(4)(a)3 and 947.013(1m), STATS. Injunctions issued under § 813.125 have a maximum life of two years. Section 813.125(4)(c).

## II. Facts

The case has a lengthy history. M.C.S. and R.J.S. have been married for many years and have five children, the youngest of whom are C.A.S. and C.D.S., the children involved in this case. As indicated, M.C.S. had a sexual relationship with W.W.W. during the time C.A.S. and C.D.S. were conceived. The relationship ended shortly after M.C.S. became pregnant with the younger child, C.D.S.

W.W.W. brought his paternity action shortly after C.D.S.'s birth. After hearing the testimony of the parties and several expert witnesses, the trial court concluded that there was a "high probability" that allowing W.W.W. to continue in his efforts to establish himself as the children's father would "more likely than not . . . cause damage and possibly irreparable harm to [the children]" and dismissed the action with prejudice. At the same time, the court apparently entered an order declaring R.J.S. to be the children's father.[2] As indicated, the supreme court affirmed the dismissal, concluding, among other things, that "[t]he existing family unit should be kept intact . . . for the benefit of C.A.S. and C.D.S.," and that "it is not in the best interests of the children to order a determination of paternity in this case." *C.A.S.*, 161 Wis. 2d at 1039-40, 468 N.W.2d at 729.

Several months later, in March 1992, W.W.W. began frequenting the children's residential and school neighborhoods, often parking his car near their house

---

[2] While we have been unable to find such an order in the record, the trial court noted in rendering its decision in this case that it had entered an "order declaring [R.J.S.] the father of these children"—apparently contemporaneously with the order dismissing W.W.W.'s paternity action.

477

and school. He spoke to them on more than one occasion—at least once while they were with friends—recounting the details of his past relationship with their mother and telling them that he, not R.J.S., is their real father and that he would "never . . . let [them] go."

The children reported these contacts to M.C.S. and R.J.S. and, several days later, Roggensack petitioned the same trial court that had heard W.W.W.'s earlier paternity action for a permanent restraining order preventing W.W.W. from contacting the children. Her petition was grounded on the general provisions of the children's code, on § 813.125, STATS., the "harassment" injunction law, and on "the inherent power of the Court."

The petition was heard on April 2, 1992. After W.W.W., M.C.S. and R.J.S. had testified, W.W.W.'s attorney requested an adjournment, stating that he wanted to question W.W.W. in greater detail about his contact with the children. Over the guardian ad litem's objection, the trial court granted the request and continued the hearing.

After several delays requested by both parties, the hearing continued on November 25, 1992. Having heard all the evidence, the trial court found that W.W.W.'s course of conduct with the children had both harassed and intimidated them, and the trial court issued the injunctions.

Other facts will be referred to in the body of the opinion.

### III. The Guardian ad Litem's Standing

W.W.W. argues first that Roggensack lacked standing to bring the injunction action because she had not been reappointed as the children's guardian ad

litem after the earlier action had been dismissed. He points to § 767.045(5), STATS., which states that "[t]he appointment of a guardian ad litem . . . terminates upon the entry of the court's final order or upon the termination of any appeal in which the guardian ad litem participates." As a result, W.W.W. maintains that the trial court erred in "entertain[ing] a request for relief from a non-entity."

He never raised the objection in the trial court, however, and we have often held that we generally will not consider arguments or issues raised for the first time on appeal. *Poling v. Wisconsin Physicians Serv.*, 120 Wis. 2d 603, 610, 357 N.W.2d 293, 297-98 (Ct. App. 1984). The waiver rule is grounded on the recognition that "[c]ontemporaneous objection gives the trial court the opportunity to correct its own errors and thereby avoids unnecessary delays through appeals, reversals, and new trials," *Christensen v. Equity Co-op. Livestock Sale Ass'n*, 134 Wis. 2d 300, 306, 396 N.W.2d 762, 765 (Ct. App. 1986), and W.W.W. has not persuaded us that we should exercise our discretion to relieve him from that waiver.[3]

---

[3] In this regard, we agree with M.C.S. and R.J.S. that any error in failing to reappoint the guardian ad litem must be considered harmless. Had W.W.W. objected to the guardian ad litem's standing, the trial court could have immediately reappointed her pursuant to § 767.045(1)(a)1 and (2), STATS., which authorize the appointment of a guardian ad litem "whenever the court deems it appropriate" when it "has reason for special concern as to the welfare of a minor child."

Roggensack also argues persuasively that the failure to formally extend her appointment was a "technical nonconformity with procedure which does not warrant reversal of the trial court's order." The supreme court has long recognized that

W.W.W. also urges us to rule that the injunction is void *ab initio*, claiming that Roggensack's petition was improperly filed with the judge who presided over the earlier paternity action. He argues that no language in § 813.125, STATS., provides that a harassment injunction may be "filed in conjunction with an action affecting the family," and he argues that the error of bringing the injunction petition before the same judge was compounded by the fact that the paternity action had been dismissed. He suggests that the effect of the filing was to bypass the usual random case-assignment process and constitutes "a deliberate attempt at forum shopping."

Here, too, W.W.W. never made any such objection in the trial court. He neither requested that the judge be substituted nor offered any challenge to the judge's authority to hear the matter, and he thus waived any such objection. *Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140, 145 (1980). Again, we see no reason to exercise our discretion to relieve him from that waiver.

### IV. Loss of Competency to Proceed Under § 813.125, STATS.

W.W.W. also argues that the trial court lost competency to exercise its jurisdiction under § 813.125, STATS., because it failed to comply with the time limit set forth in paragraph (3)(c) of the statute, which

---

appointment of a guardian ad litem is a matter of procedure, not one of jurisdiction. *Estate of Thompson*, 212 Wis. 172, 178, 248 N.W. 167, 169 (1933). And "before noncompliance with procedural statutory requirements may result in reversal of the circuit court's holding," the complaining party must show prejudice. *D.S. v. Racine County*, 142 Wis. 2d 129, 135, 416 N.W.2d 292, 295 (1987). W.W.W. has not done so here.

requires the court to "hold a hearing on issuance of an injunction within 7 days after the temporary restraining order is issued . . . ."

There is no question that the trial court *began* the hearing within the seven day period, as required by the statute. And we note that even before the hearing began, W.W.W. sought a continuance. The request was denied and later in the hearing W.W.W.'s attorney renewed it, stating that he wished to examine W.W.W. "at length and in detail" about his contacts with the children and that he intended to call expert witnesses to testify. When Roggensack objected to any continuance, W.W.W.'s counsel stated that he had another appointment which would require him to leave very shortly, and he indicated that an adjournment was necessary in order that W.W.W. could be "fully and properly heard." He also attempted to meet Roggensack's objection by agreeing to have the temporary restraining order continue in effect until such time as the hearing could be resumed. And when the court indicated that it would not be able to reschedule the matter for some time, counsel indicated that he, too, would be unavailable for several weeks.

As indicated, a variety of scheduling conflicts—including a request by W.W.W.'s counsel for a further delay of nearly three months—prevented the hearing from resuming until November 25, 1992, some seven months after it had begun.

As in the other instances, W.W.W. raises this issue for the first time on appeal. He never challenged the court's competency to proceed for violation of the seven-day time limit when the hearing resumed in November. In *In re G.L.K.*, 153 Wis. 2d 245, 248, 450 N.W.2d 498, 499 (Ct. App. 1989), we held that the failure to raise the issue of the juvenile court's competency to proceed with

a CHIPS hearing within the statutory time limit waived the objection, and we declined to exercise our discretion to consider it on our own.

W.W.W. argues that *G.L.K.* has been undercut by the supreme court's decision in *In re B.J.N.*, 162 Wis. 2d 635, 469 N.W.2d 845 (1991). *B.J.N.* involved a challenge to the competency of the trial court to extend a dispositional order in a CHIPS case when no hearing was convened within thirty days, as required by § 48.365(6), STATS., which provides that, whenever a request is made to extend a CHIPS order prior to its termination date, and the court is unable to hear the petition before that date, it "may extend the order for a period of not more than 30 days." The trial court in *B.J.N.* scheduled the hearing in a timely manner but later rescheduled it to a date several weeks beyond the thirty-day limit, with the result that no hearing was held, or even commenced, prior to the statutory deadline. The supreme court held that the court lost competency to proceed by not convening a hearing within the thirty-day period and also that the complaining party could not be held to have waived the competency objection by failing to raise it in the trial court, stating: "[W]e have consistently ruled that a court's loss of power due to the failure to act within statutory time periods cannot be stipulated to [or] waived." *B.J.N.*, 162 Wis. 2d at 657, 469 N.W.2d at 854.

We agree with Roggensack that *B.J.N.* is distinguishable for, in that case, *no* hearing was held within the prescribed time limit. Here, the hearing was held and all of the witnesses who were present in court testified. It was twice adjourned and continued at W.W.W.'s request, accounting for nearly four months of the total seven-month delay. Under all of the circum-

stances, we conclude that the trial court did not lose competency to proceed with the hearing on November 25, 1992.

## V. Authority to Enter the "Age-Eighteen" Injunction

As we have noted, the trial court grounded its "age-eighteen" injunction on general provisions in ch. 767, STATS., and also on its "inherent powers." W.W.W. argues that the court had neither statutory nor inherent authority to issue the age-linked injunction. It is a question of law which we decide independently. *In re E.C.*, 130 Wis. 2d 376, 381, 387 N.W.2d 72, 74 (1986).

Among the sources from which courts receive their powers are the statutes and their own "inherent judicial authority." *E.C.*, 130 Wis. 2d at 381, 387 N.W.2d at 74. We are satisfied in this case that the trial court had the authority to issue the age-linked injunction under either or both sources.

Section 767.01(1), STATS., states that "[t]he circuit courts have . . . authority to do all acts and things necessary and proper in . . . actions [affecting the family] and to carry their orders and judgments into execution as prescribed in this chapter." "Actions affecting the family" include both the determination of paternity and actions "[t]o enforce . . . a judgment or order in an action affecting the family granted in this state . . . ." Section 767.02(1)(i) and (L), STATS. Thus, the circuit court has statutory authority to do all things necessary and proper to maintain the integrity and effectiveness of its orders and judgments, and we believe that that is precisely what the trial court did when it entered the injunctions in this case.

W.W.W. disagrees. He argues that the injunction was not necessary to enforce the order dismissing his paternity action. He maintains that, because the court never ruled that he was not the children's biological father but merely denied him the legal right to seek a paternity determination, his continuing contacts with the children do not amount to "a challenge to the trial court's authority [or] the finality of its judgment." We are not persuaded.

The trial court dismissed W.W.W.'s action because it concluded that allowing him to proceed with his claim that he was the children's father was contrary to the best interests of the children. In so ruling, the court relied on the opinions of expert witnesses that informing the children that W.W.W. was their biological father could lead to "a substantial risk of harm" to them. *C.A.S.*, 161 Wis. 2d at 1038, 468 N.W.2d at 728.[4]

What W.W.W. asks on this appeal is for us to conclude that the trial court, after ruling that it would be against the children's best interest to allow him to pursue his parental claims in court—and having had that ruling affirmed by the state's highest court—nonetheless remains powerless to preclude him from pursuing the same objectives outside the legal system. With adverse rulings from both the trial court and the supreme court in hand, W.W.W. nonetheless decided to carry on alone and, contrary to both the letter and spirit of the court rulings, began approach-

---

[4] The supreme court discussed the experts' testimony in considerable detail in *C.A.S.* and, as we have indicated, upheld the trial court's determination that allowing W.W.W. to continue the action would be inimical to the children's best interest. *In re C.A.S.*, 161 Wis. 2d 1015, 1038-40, 468 N.W.2d 719, 728-29 (1991).

ing the children directly to accomplish what the courts had plainly and forcefully barred him from doing—asserting his claimed fatherhood over the objections of the children's parents. We agree with M.C.S. and R.J.S. that, were we to countenance such a result, we would effectively nullify both the trial court's judgment and the supreme court's ruling in the former action. We believe that the trial court could properly conclude that issuance of the age-linked injunction was both "necessary and proper" to protect and carry out its judgment in the earlier paternity action, and that it thus had the power to enter the injunction under § 767.01(1), STATS.[5]

In addition to the statutory power to carry their orders into execution, trial courts have broad "inherent" powers to accomplish the same ends. In *Dennis v. Dennis*, 117 Wis. 2d 249, 344 N.W.2d 128 (1984), a divorce proceeding, the trial court entered a support order that it recognized was beyond the husband's pre-

---

[5] W.W.W. suggests that the "all acts and things necessary and proper" authority under § 767.01(1), STATS., only authorizes the court to enforce the dismissal of the *action itself*, not "each and every finding made in support of its order or judgment." Again, we disagree.

As we have noted, the trial court's order dismissing the paternity action was not based merely on its conclusion that W.W.W. should be precluded from establishing paternity. The order was grounded on the court's adoption of the expert witnesses' conclusions that it was in the best interest of the children to protect them from information that would be harmful to them and would carry the potential of destroying their existing family relationship with their mother and father. In addition, the supreme court held that W.W.W. has no constitutionally protected interest in establishing a parental relationship with the children. *C.A.S.*, 161 Wis. 2d at 1031-32, 468 N.W.2d at 725-26.

sent ability to pay. Noting, however, that he was "in good health, has ability and a good mind," the court directed the husband to seek "additional or alternative work" and to apply to "at least . . . ten places per month" to seek such work. *Id.* at 251-52, 344 N.W.2d at 129. The court later held him in contempt for failure to pay the ordered support and for "failing to make application for work as ordered." *Id.* at 255, 344 N.W.2d at 131. He challenged the "seek-work" order on appeal, and the supreme court sustained the order, concluding that it was "not an abuse of discretion." *Id.* at 259, 344 N.W.2d at 132. In so holding, the supreme court quoted as follows from *Schroeder v. Schroeder*, 100 Wis. 2d 625, 631-32, 302 N.W.2d 475, 479 (1981):

> Judges presiding in actions affecting marriage have no less power than judges presiding in other actions. It is clear that support payment, division of estate and maintenance orders issued by a court affect the rights and remedies of a party in an action and the judge is authorized and has the duty to assure those rights and remedies will not be impaired, impeded, defeated or prejudiced.

*Dennis*, 117 Wis. 2d at 259, 344 N.W.2d at 132. We believe the same principles apply in this case.

The *Dennis* court went on to note that, under § 767.01, STATS., "Wisconsin courts have authority to do all acts and things necessary and proper in family actions to carry their orders and judgments into execution," *Dennis*, 117 Wis. 2d at 259, 344 N.W.2d at 132-33, and concluded:

> We have held that courts, in addition to statutory authority to carry their orders and judgments into execution, have the inherent power to do so. [In] *In Interest of D.L.D.*, 110 Wis. 2d 168, 180, 327 N.W.2d

682 (1983), we held: "Where a court is granted jurisdiction over subject matters, it is implicit in that grant of jurisdiction that a court can use the contempt power to effectively carry out the functions ordered by the legislature." In our organized society, it is necessary that courts be able to carry out their orders. The propriety of those orders can be tested on appeal.

*Id.* at 259-60, 344 N.W.2d at 133 (citation omitted).[6]

Just as the trial court in *Dennis* was held to possess the inherent power to issue and enforce a "seek-work" order, we believe the trial court in this

[6] There is little question that the trial court had jurisdiction to entertain Roggensack's petition. It is well settled that Wisconsin circuit courts do not depend solely on the statutes for their powers. They are vested with "plenary jurisdiction" under Article VII, Section 8 of the Wisconsin Constitution, which gives them "original jurisdiction in all matters civil and criminal within this state . . . ." *See Eberhardy v. Circuit Court,* 102 Wis. 2d 539, 548, 307 N.W.2d 881, 885 (1981). This constitutional grant of jurisdiction has been characterized as "extremely broad" and "all-encompassing," *id.* at 548, 553, 307 N.W.2d at 885, 887; it is "subject matter jurisdiction to entertain actions of any nature whatsoever." *Mueller v. Brunn,* 105 Wis. 2d 171, 176, 313 N.W.2d 790, 792 (1982).

W.W.W. stresses that family courts "are constrained by the provisions of the statutes," citing *Whitwam v. Whitwam,* 87 Wis. 2d 22, 27, 273 N.W.2d 366, 368 (Ct. App. 1978), where the supreme court struck down a trial court order conditioning a future grant of alimony upon the dependent spouse's receipt of public assistance, noting that "[a] family court judge's power to make judgments and orders regarding alimony or maintenance is limited to what the statutes allow." As *Dennis* and other cases discussed in this opinion indicate, however, family courts, like courts generally, possess inherent powers to ensure the operation and validity of their orders and judgments.

case—which, as we have indicated, had previously ruled that permitting W.W.W. to continue asserting his claim of fatherhood was contrary to the children's best interests—had the authority to enforce the children's legal parents' right to prohibit unwanted contact with them, or unwanted information conveyed to them, in a situation where no statute expressly prohibits such an action.

And whether that authority derives from the court's inherent judicial powers, or whether it has its source in the court's plenary subject matter jurisdiction under Article VII, Section 8 of the constitution to entertain any matters brought before it, the result is the same. The injunction was "necessary and proper," not only to carry out the court's orders and judgments, but also to protect the rights and interests of M.C.S. and R.J.S. and, of course, those of the children, which are considered "paramount" in all actions affecting the family. *Steinbach v. Gustafson*, 177 Wis. 2d 178, 185, 502 N.W.2d 156, 159 (Ct. App. 1993).

### VI. *Evidence to Support the § 813.125, STATS., INJUNCTION*

W.W.W. confines his argument on this point to an assertion that there is insufficient evidence to support a finding that he *intended* to harass the children. As we have noted above, in order to obtain an injunction under § 813.125, STATS., the petitioner must establish, among other things, that the respondent has, "with intent to harass or intimidate another person," engaged in a course of conduct which actually does harass or intimidate the person and which serves no "legitimate purpose." Section 939.23(4), STATS., defines "with intent to" as meaning "that the actor either has a purpose to do the thing or cause the result specified, or

is aware that his or her conduct is practically certain to cause that result."

■

Intent is a fact: " 'The state of a man's mind is as much of a fact as the state of his digestion.' " *State v. Lossman*, 118 Wis. 2d 526, 543, 348 N.W.2d 159, 167 (1984) (quoting WILLIAM L. PROSSER, THE LAW OF TORTS § 104, at 745 (3d ed. 1964)). However, because intent is, by its very nature, "rarely susceptible to proof by direct evidence," it nearly always is established by circumstantial evidence and inference. *Clark v. State*, 62 Wis. 2d 194, 197, 214 N.W.2d 450, 451 (1974). Indeed, we have said that intent is a fact that "must be inferred from the acts and statements of the person, in view of the surrounding circumstances." *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 569, 360 N.W.2d 65, 66 (Ct. App. 1984). In situations where only one reasonable inference may be drawn from the evidence, the drawing of that inference is a question of law, which we review independently. *Vocational, Technical & Adult Educ., Dist. 13 v. DILHR*, 76 Wis. 2d 230, 240, 251 N.W.2d 41, 46 (1977). Where, however, more than one inference may reasonably be drawn from the established facts, we must accept the inference drawn by the trial court.

> The drawing of an inference on undisputed facts when more than one inference is possible is a finding of fact which is binding upon an appellate court. It is not within the province of . . . any appellate court to choose not to accept an inference drawn by a factfinder when the inference drawn is a reasonable one.

*State v. Friday*, 147 Wis. 2d 359, 370-71, 434 N.W.2d 85, 89 (1989).

The evidence at the hearing established that, beginning in 1991, W.W.W. began traveling from his home in Madison several miles to the neighborhood in which M.C.S., R.J.S. and the children lived, to watch and sometimes talk to the children. On March 2, 1992, he approached the older child, C.A.S., on her way home from school. He told her that he and her mother had been "boyfriend and girlfriend" in the past and that he, not R.J.S., was her father. He told her he had been involved in a long court case "trying to figure out who her father is," and that despite the fact that he is her true father, "the government decided that [R.J.S. is] their father." He told her that he loved her and that he "was never going to let her go."

At that point, C.D.S. approached them with a group of friends and W.W.W. "brought the group up to date on the conversation" he was having with C.A.S. He told the children that blood tests could be taken to establish parenthood, and that there was "a serious dispute about who [C.A.S.'s and C.D.S.'s] father is." According to W.W.W., all of the children were interested in his story and "liked the idea of solving the mystery" as to who C.A.S.'s and C.D.S.'s father really was. He told C.A.S. and C.D.S. that "someday [their parents] may try to move and take you away from ever being able to know the truth about which man is actually your natural father, the blood father," and that "it was important for us to stay together because I felt as though we were family."

W.W.W. testified that C.A.S. and C.D.S. appeared to agree that the "mystery" should be solved, and that when the other children heard that, they all began "literally cheering" on the sidewalk. W.W.W. then told C.A.S. and C.D.S. to go home and "bring it up with their

parents," and he said they agreed to meet him at the same spot the next morning on their way to school.

W.W.W. acknowledged that C.A.S. appeared to be "ill at ease" when he approached her on March 2, and he thought at the time there was a possibility that the other children would tease C.A.S. and C.D.S. about what he was saying to all of them. He said he told her that she should not pay attention to them. W.W.W. also testified that his conversation with C.A.S., C.D.S. and the other children lasted approximately twenty minutes.

C.A.S. and C.D.S. told their mother about the encounter when they got home. According to M.C.S., they "burst" into the house stating that a man had told them "Dad isn't our real dad," and that he (the man) was their real father. M.C.S. described the children as "agitated and anxious" and stated that they were shouting and "upset," which was unusual for them. She said that C.A.S. was frightened and told her she had been "shaking" during and after the encounter with W.W.W.

When R.J.S. came home from work, the children were still excited and he noted that they appeared "anxious" and "very confused" when they told him about the encounter. According to M.C.S., they were still upset at breakfast the next morning.

The following morning, W.W.W. waited in his car along the children's usual route to school. When C.A.S. and a companion passed by on their bicycles without stopping to talk to him, W.W.W. started his car and followed them for several blocks. He eventually pulled in front of them, stopped and said: "Have a great day, girls." W.W.W. returned to the school in the afternoon and watched as M.C.S. picked C.A.S. up. He stated that C.A.S. saw him there.

When C.A.S. described the incident to M.C.S. that afternoon, she said that W.W.W. had followed her and a friend and that she had "felt safe because the crossing guard was there." W.W.W. returned to the school again the next morning, where C.A.S. again saw him sitting in his car watching her. When asked at the hearing whether C.A.S. had ever expressed to her that she was "afraid" of W.W.W. "[a]nd the way in which he attempted to contact her," M.C.S. responded: "[Y]es, it made her upset."

W.W.W. claims these facts are insufficient to establish or infer that he had the intent to harass or intimidate C.A.S. and C.D.S. Indeed, he asserts that the trial court "expressly found" that he had no such intent, citing us to the following comments made by the court at two points during the course of rendering its decision from the bench: "I'm not sure whether [W.W.W.] is merely naive or whether he just lacks an understanding of the developmental delicacy of children . . . . [H]e just simply doesn't, won't or can't understand how frightening that stalking behavior is to a child."

It is important to consider those remarks in the context in which they were made. The court began its discussion by pointing to W.W.W.'s "very carefully planned" meetings with the children for the purpose of disclosing to them "his version of probably the most important and fundamental questions of their identity and their security in life." The court noted that W.W.W. had studied the children's neighborhood to such a degree that he had "almost an almanac knowledge of the neighborhood" and ruled that, based on the testimony of the parents and the court's own experience in life, his conduct had the effect of harassing and intimidating the children.

It was at this point that the court remarked that W.W.W. must be either naive or lack understanding of children if he did not think his conduct of confronting them on the street with their friends—and, particularly, his pulling in front of C.A.S. in his car to stop her as she rode by on her bicycle on the way to school—was intimidating to her: "[I]f he doesn't think that that is intimidating and fearful to a child, then he does not understand the mentality of a child at all."

We do not consider the cited remarks to be in any sense a finding or determination that W.W.W. did not intend to harass or intimidate the children. And while the court never made a specific "magic-word" determination that W.W.W.'s contacts with the children were undertaken with the intent to harass or intimidate them, we are satisfied that such a determination may be inferred from the record and the trial court's remarks.[7]

The court was satisfied, for example, that W.W.W.'s "premeditat[ed]" planning of his contacts with the children and his persistent course of conduct with them

> reflects his intention . . . to contact these children over the objection of their parents, claiming rights that under the law he does not have, that is, the right of a natural parent to . . . communicate [to the children] the most intimate and basic fundamental

[7] Even if such a finding—or the express drawing of such an inference—could not be inferred from the record, we have long recognized that we may nonetheless affirm in such situations "if the decision is clearly supported by a preponderance of the evidence." *Miller v. Miller*, 171 Wis. 2d 131, 134, 491 N.W.2d 104, 106 (Ct. App. 1992). We believe the record, which we discuss at length in this opinion, provides the necessary support for such a determination.

information about themselves, who they are, who their parents are, and [invade] the[ir] security to be free of uninvited contacts from legal and factual strangers in their lives.

The fact that this conduct is harassing and has intimidated the children is reflected [in the record] ....

Finally, the court stated:

[F]or [W.W.W.] to seek this kind of contact outside of the protection of parental permission, in public, in the presence of the children's friends, knowing that, by his own admission, it subjected the children to the possibility of cruel teasing from other children, and ignoring what is the obvious danger of unsettling the sense of security and the sense of identity that children want and need as they're growing up, these contacts [serve] no legitimate purpose ....

These excerpts and other portions of the trial court's lengthy oral decision satisfy us that, despite the absence of an express "magic-word" determination, the court indeed decided that W.W.W., by his persistent and thoroughly planned actions, intended to—and did in fact[8]—harass and intimidate C.A.S. and C.D.S. It is a reasonable inference from the established facts, and

---

[8] W.W.W. does not argue that there is a lack of evidence that his conduct harassed or intimidated the children, other than to suggest that, while his acts may have been harassing with respect to M.C.S. and R.J.S., "the children cannot vicariously be harassed."

The evidence discussed above concerning the children's remarks and behavior at home in the hours and days following the initial contact, considered in light of the children's ages (they were eight and ten years old at the time), satisfies us that

whether we review it independently or pursuant to the deferential standard applicable when more than one reasonable inference may be drawn from the established facts, we are satisfied from our review of the record that the required intent may be inferred from those facts.

## VII. Overbreadth

Finally, W.W.W. argues that the injunctions are overly restrictive and "unreasonably oppressive," and he asks us to overturn them on that basis.

The scope of an injunction is within the sound discretion of the trial court, *State v. Seigel*, 163 Wis. 2d 871, 889, 472 N.W.2d 584, 591 (Ct. App. 1991), and the limited scope of our review of discretionary rulings is well settled. We may not overturn a discretionary determination that is demonstrably made and based upon the facts of record and the appropriate and applicable law. *Id.* at 889, 472 N.W.2d at 592. And because the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary rulings. *Steinbach*, 177 Wis. 2d

---

the trial court was correct in determining that W.W.W.'s actions harassed and intimidated them. As the court stated:

> The fact that this conduct is harassing and has intimidated the children is reflected in the ... description [given by] the mother and the father of the emotional state of the children at the time that they initially burst into the home with reports of this uninvited contact with this stranger. The court also relies on its knowledge of human affairs and its experience in the affairs of life in concluding and inferring from these facts that these contacts and appearances of a person that they don't know, who causes upset in their parents' lives, which the parents telegraph and demonstrate to the children, to a greater or lesser degree, is an intimidating course of conduct to the children.

495

at 185, 502 N.W.2d at 159. Injunctions, of course, must be specific as to the prohibited acts and conduct in order for the person being enjoined to know what conduct must be avoided. *See Bachowski v. Salamone*, 139 Wis. 2d 397, 414, 407 N.W.2d 533, 540 (1987).

The injunctions in this case prohibit W.W.W. from contacting the children, either directly or indirectly, and from frequenting specific streets around their residence and along their route to school. Each is accompanied by a map specifically designating the streets in question.

W.W.W. argues first that the two-year § 813.125, STATS., injunction goes beyond the court's statutory powers in such cases, citing subsection (4) of the statute, which authorizes the court to grant an injunction "ordering the respondent to cease or avoid the harassment of another person." He claims that, by going beyond a simple order enjoining him from harassing the children by doing certain specified acts, the injunction goes beyond the court's powers under the statute.

Not only do W.W.W.'s past actions indicate that he will not cease harassing C.A.S. and C.D.S., but he has stated that he plans to "never let them go." The trial court recognized this when it noted that W.W.W. "simply cannot be trusted because of the extent of the behavior and the length of time and the lengths to which he will go" to continue having contact with the children, despite a decision of the state's highest court in "litigation in which [W.W.W.'s] position was fully litigated and has reached a final judgment."

The trial court adequately explained the need for such an unusually restrictive injunction in order to finally put a stop to W.W.W.'s harassment of the children. The record bears out that need and, under all the

circumstances of the case, we cannot say the result reached by the trial court is unreasonable. It was a sustainable exercise of discretion under § 813.125, STATS.

W.W.W. also argues briefly that the terms of both injunctions are "unreasonably oppressive" because, rather than simply enjoining him from going to the children's home and school and ordering him to avoid their routes of travel during school hours, it bars him from all contact with the children and prohibits him from traveling on several city streets. Other than to state generally that such an order amounts to an "abuse of discretion" on the court's part, W.W.W. does not explain the argument further. We have long held that we need not consider arguments that are "not developed themes reflecting . . . legal reasoning," but rather are supported only by "general statements." *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992).

Even so, the record reveals that the trial court carefully balanced W.W.W.'s constitutional and other rights against the need to protect the children and their parents from unwanted encounters with him. The court struck that balance against W.W.W., concluding that, in light of W.W.W.'s "history of pretextual presence in [the children's neighborhood] . . . for the purpose of contacting them," it wanted to establish "the minimum area which will provide these children a zone wherein [W.W.W.] cannot be present for any purpose . . . ."

To be effective, injunctive relief must be tailored to the necessities of the particular case. *Seigel*, 163 Wis. 2d at 890, 472 N.W.2d at 592. And while the terms of

the injunction are highly restrictive, the trial court explained its reasons for imposing the restrictions and balanced the rights, needs and interests of the children and their parents against those of W.W.W. On this record, we cannot conclude that it struck an unreasonable balance.

As we noted earlier, our review of discretionary determinations of the trial courts is quite limited. Where the record reveals an appropriate exercise of discretion on the court's part, we will affirm the decision even if it is one we ourselves might not have made were we ruling on the matter in the first instance. *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991).

*By the Court.*—Orders affirmed.